The next argued case is number 19, 1356 Atkins v. United States. Mr. Rogers. Thank you, Your Honor. Good morning, and may it please the Court, I present the appellants Charles and Jane Atkins. This case involves a theft loss of over $2.5 million from a pump and dump scheme. The government has conceded that this is a theft, but our main reason for being here is the year of loss. And I think at the outset we probably want to talk about the standard of review. There's a disagreement between the parties on that. Our belief is that this is a de novo review of the trial court's determination, because its legal determination was the assignment of the burden of proof is what we believe is the error here. Certainly there's de novo review with respect to the legal standard that the court employed, but with respect to the totality of the circumstances and the fact findings that the court made relating to what could have reasonably been known at any given point in time. Those we have to review with deference, right? That's correct, Your Honor. And our view was that under 7491A of the Internal Revenue Code, once we put on credible evidence as to the issue, the burden shifts to the United States. And however, we don't think the court, the things the court seemed to rely upon in its final ruling as to, you know, what's unknowable were the things that we believe the government had the burden to show, to go forward with evidence on. And because what they did was they had a bunch of, why didn't you? You know, why didn't you pursue arbitration, continue to pursue arbitration? Why didn't you pursue these two other parties, Mr. Kozak? So is it your point that by using the unknowable standard from the Tenth Circuit that that's where the burden shifting effectively occurred? That's where the burden shifting effectively occurred because, you know, for a reasonable prospect of recovery to exist, the standard is that it has to lead to a substantial possibility that the plaintiff would recover, you know, would succeed on the claim. And just succeeding on the claim, I think in this case, means getting money. And the government showed no evidence that these would ever lead to any money. There are a couple of things that the court focused on a lot. One is the Odyssey Capital. Well, two things on Odyssey Capital. One is there was never any proof that there was any privity between our client and Odyssey Capital. Odyssey Capital is a third party who was not a party who he never dealt with. And second of all, I don't think there's even any real evidence that he knew about Odyssey Capital in 2004. If we're saying what he knew or should have known in 2004, the only reference to Odyssey Capital was in the indictment, which did occur in 2004, which is also the year in which you had certain other things happen, like they pled guilty and they entered into plea agreements. Was the indictment sealed when it was first issued? It was, but Mr. Atkins was in contact in which the court did find that he knew about it in 2004 because of his contacts with Mr. Kozak, who shared with him the fact that the indictment... Right, so he knew about the indictments, he knew that there were forfeiture requests in the indictments seeking all property, and he knew that they were seeking to bar them from practicing, right? Correct. Those had already occurred in 2004. But he didn't know any of the other details of the indictment. He did say he saw the indictment in his testimony, and so I think he saw the indictment, and again, Odyssey Capital was referred to in the indictment, but again, that's another item the government knew about, and if it was forfeiting assets and that sort of thing... So Odyssey Capital was never listed as a co-conspirator or an unindicted co-conspirator, anything like that? It was not. It was just that they were using it as a vehicle for part of their schemes. What about Freeman? Why didn't he sue Freeman? I think there were two points in that, Your Honor. He didn't really... His name appeared on maybe a few trading slips, but he never really knew who he was, and he certainly wasn't a principal of Donald and Company. He went after the principals of Donald and Company, Mr. Stetson, Mr. Antonelli, and Mr... I'll start this with a T. He went after them and not the lesser players because his view was that Mr. Freeman was not a very important part of the scheme. And again, at the end of the day, he was also indicted. He was also convicted. He also had cooperation agreements in 2004, so there's no evidence that he had any assets, that there was any substantial possibility that pursuing him would have ever led to any assets in 2004. And the restitution fund, was that limited to the Elephant Classica stocks, or could you have recovered from the restitution fund any losses relating to the money transfer? There is a possibility that he could have... He was certainly included in the notices that he could participate in restitution, that he was a victim, but it was never really clear whether he could or could not. Well, he had small holdings in at least one of those two stocks. Correct. He had small losses. My term was never listed. My term was not listed, and I think that also gave him some... His feeling was that he should not be pursuing that. Also, there's no evidence... The only evidence in the record, which goes all the way through 2010, I mean 2014, was there was very little recovery on those restitutions claims. I mean, it was minuscule. It was like 0.0001% of the total restitution ordered. So he would have gotten pennies on his dollars that he lost of $2.5 million, because there was over $12 million of victims in that case. What kind of evidence, if any, is there in the record about what it would have cost your clients to inquire further in 2004 about, for example, Odyssey Capital, about the other things that were at least theoretically potential sources of monetary recovery? There was no evidence of what it would have cost. He just felt like he had spent a great deal of money up to that point in the arbitration of, I think, $25,000 or $30,000 at that point. And then he hears these people are all indicted, and he said, you know, they're going to be... and that they have these cooperation agreements, and that they also lost... they also were having forfeitures and fines. And he was of the opinion, you know, there's nothing left here. And he'd been down that road before in 2001 with another case, which he did pursue all the way to judgment, and discovered that he wasn't... he didn't get anything in that point. So I think his feeling was that after the indictment occurred and these cooperation agreements occurred, and the loss of... and basically, where are these people insolvent for all intents and purposes? And, you know, a judgment's only good if it's... if there's money there. And I think... You agree, by the way, just on the regulatory interpretation point, that the question is not whether there was a prospect of recovering the entirety of the loss, but just some non-trivial recovery. Because the regulation says about no portion. Right. It says no... the regulation says no portion, but it also, I think, in this case, or in any case, really, is that if it's de minimis or insignificant... Right, that's right. I was trying to exclude the truly insignificant. But you don't get to prevail if it were merely true that there was no chance that half or some large portion was going to be recovered. If there's a chance of a large recovery that he knew about in 2004, yes. Or that came up later, and there's no evidence that any of these things ever was going to lead to money even later, even Odyssey Capital. And again, it would have required piercing a corporate bail and all kinds of other things to get to Odyssey Capital with whom he had no privity. So I think that was part of it. The other thing I think that's very important here is Mr. Kaplan's findings. The IRS appeals officer, his memo to the government when he transferred the case over was very clear that 2004, in his opinion, was the year of loss. And because Mr. Atkins had lost the money and he did not see any avenues of recovery. And I think that speaks volumes here. Also, as we said the last time we were here, that this is analogous to Revenue Procedure 2009-20 in which, in that case, which is a Ponzi scheme case, the government's Revenue Procedure says the year of indictment is the controlling year for the year of loss. The court simply said they're not the same thing. Correct, they're analogous. Ponzi scheme is not the same as a pump and dump. But it's analogous, I do believe. I mean, it's a securities crime in which he lost money. And the reg actually says and other similar offenses in that procedure. But we believe it's analogous at the very least. And if you're doing that for Ponzi scheme victims, it seems fair and just to consider that for also victims of a pump and dump scheme. Because the year of indictment is really clearly the year in which people have lost a great deal of money. And lastly, the last clear thing we want to mention is that the failure to turn over evidence, or the, I think it was clear error by the court, in that if they're going to raise all these things about subsequent issues of things we didn't pursue, then not turning over the criminal files or the Donald and Company records made it very hard for us to pursue that line of appeal to them. Because there was no evidence of, you know, the records were with the government. And if they were going to raise it, they should have at least put on evidence that showed that yes, there was cash here. Or yes, Odyssey Capital had a lot of money in 2004. And there's no evidence of that on the record because they had the records. But the government concedes that it had no knowledge about Odyssey Capital. But the government is relying on this no knowledge. In other words, I don't know anything, so therefore you can't prove your case. Well, if they're going to raise it, they had Donald and Company's records. They had all these criminal defendants' records, financial records. I would assume, we don't know what they have because they never produced it. But we did ask for all their criminal files in this case. So it's our view that, you know, clearly that's the case. You know, we would ask the court to reverse and find that the year of loss was 2004. And that the amount was the requested amount of $2.57595819 million. I'll reserve the rest of my time for rebuttal. Thank you. Thank you. Ms. Brainerd. Thank you. So tell us when the government thinks this loss was incurred. Your Honor, that's an excellent question. And the last time the government was before this court on appeal, we were focused on the year in which the taxpayers abandoned their arbitration claim, 2008. Now, this court instructed the Court of Federal Claims and us that on remand, the analysis should be a holistic analysis based on all the facts and circumstances. And I know that this is not the answer that you want to hear. But on this record, which focuses on 2004, because that is the year the taxpayers claimed their loss in, it's difficult to say at exactly which point there was no reasonable prospect of recovery. The facts simply haven't been developed for the other years because the taxpayers chose to put all of their eggs in the basket of 2004. They could have, of course, filed claims for alternative years. They chose not to do that. In fact, with respect to 2008, they could have filed a timely refund claim nearly a year and a half into this litigation, and they chose not to do so. So, you know, unfortunately, it's difficult to say, looking at the holistic analysis, what particular year is the right year. And importantly, it's the taxpayers' burden to show what year is the right year. But we also instructed the last time around, not just that abandonment was not a prerequisite, but that the test is essentially one test, that is the reasonable certainty of a reasonable prospect of recovery. And yet, if you go through the claim court's decision, you almost never see that standard discussed. She goes on and on and on about this unknowability that it comes out of a Tenth Circuit case that arguably wasn't even important to the ultimate decision in that case because the facts were so much different from the facts here. And so what are we supposed to do with the fact that we said what the standard is, and now we've got the court below telling us they used a different standard, that they said that if it's unknowable, you therefore can never satisfy your burden. So, Your Honor, one of the formulations, this court gave two alternate formulations, as I'm sure you remember in its prior opinion. And one of those formulations of the test is that the taxpayer must show that it can be ascertained with reasonable certainty that there will be no recovery. And that starting with the year of discovery... No, that there's no reasonable prospect of recovery. Well, no, Your Honor, this is, I apologize, but it's at 917, note 4 of the prior opinion. That is the word-for-word formulation of the test. The alternative, the two tests that the court gave in the prior opinion were the first year in which no reasonable prospect of recovery exists anymore, starting with the year of discovery, which is what you're thinking of. And then in a footnote, this court said that the test would be alternatively stated as the year in which it can be ascertained with reasonable certainty that there will be no recovery. But either way, the key is that the taxpayer has to show that in this particular year, in this case in 2004, that there was no reasonable prospect of recovery. The alternative standard, with reasonable certainty that there will be no recovery. And so, as the Court of Federal Claims explained, if it's the case that in the year the taxpayer has chosen, things have not crystallized sufficiently to know with reasonable certainty that there will be no recovery, or to know that there's no reasonable prospect of recovery, the taxpayer has to wait until the facts have settled more. The things that the court focused on in terms of crystallization, that's part of my problem. Essentially, the court and the government conceived that the main bad guys, the main wrongdoers, and all of their assets were not going to be reachable. And so that the court goes and looks at things around the margin, that perhaps you could have brought a claim against this Odyssey Capital. But there's no evidence anywhere that Odyssey Capital was somebody that a claim could have been brought against. And then they say, perhaps you could have gotten restitution, even though your stock wasn't in the scope of the restitution order. I mean, I don't, these are just, okay, maybe you could have taken a flyer. You could have thrown a Hail Mary pass and spent a ton of money to grab some little bits around the edges. This goes back to what Judge Toronto was talking about, which is, it's not a question of, is there a reasonable prospect of a big recovery? I mean, the court simply focused on, could you get a pittance and spend a ton of money and time to get to a pittance? Is that enough to be a reasonable prospect of recovery? Your Honor, the court focused on the fact, and this comes from the Supreme Court's decision in Boehm in 1945, that while the taxpayer's subjective belief about what will happen may be considered, that it's the objective evidence and the record that must govern. And in 2004, three of the four Donald Company principals, I'd like to talk about Mr. Freeman in a moment, but three of the four Donald and Company principals, Stetson, Volman, and Ingrassia, had been indicted. And Mr. Adkins testified, and the court found that he was aware that they intended to plead guilty. But in 2004, Mr. Adkins did not know anything about the assets that could be available for recovery, and could not have known about the financial obligations that the defendants had made in their cooperation agreements and their plea agreements. They could not have known in 2004 how many victims there were, the extent of the losses in the case. They knew their own, of course, but they didn't have the information about the rest of the picture. And so in 2004, it was simply not possible to know the likelihood of recovery from Stetson, Volman, and Ingrassia, those three of the four principals that they named. But the indictments did seek full forfeiture of all of their assets. The indictments did have forfeiture counts in them, yes. But the indictments also included securities fraud charges, which require restitution to victims. And that's, of course, a third independent avenue of recovery that the Court of Federal Claims found was unknowable in 2004. I presided over a lot of trials having to do with securities fraud and other forms of fraud. I never saw any where more than a few pennies were ever recoverable from those whose assets the government seized. I mean, the whole point is that this was a fraud and that they couldn't maintain it anymore, which is how they get caught. Well, Your Honor, the pump and dump scheme may be a little bit different from other kinds of fraud in that the people presiding over the fraud, in this case, the Donnellan Company principals, do often make actual money, which they cash out of the fraud. In this case, in fact, Mr. Adkins knew about Odyssey Capital. He testified at page 1739 of the appendix that he knew about Odyssey Capital as early as 2003 or 2004. And that company was a holding company for the stocks the Donnellan Company itself owned, and also the profits of the pump and dump scheme accumulated in that company. But the government never produced any evidence that there were any profits or that there were any assets in Odyssey Capital. Well, Your Honor, I think there are a couple of things to talk about with respect to whether the government produced evidence. First, the taxpayers have the burden of proof in this case. Taxpayers always have the burden of proof to show entitlement to a deduction. Yeah, but the government's supposed to produce documents in response to document requests. Sure, Your Honor. I'd be happy to talk about the motion to compel. The taxpayers filed a motion to compel in the discovery process. That motion to compel sought an enormous range of documents, many of which were protected by, for example, taxpayer privacy in Section 6103 of the Internal Revenue Code. They asked for, with respect to that issue, the tax treatment of every other victim in this scheme, which clearly the government is not able to turn over. That's protected information. They asked for the entire criminal investigation files of the related criminal cases here. The FBI determined that, unsurprisingly, many of those documents are protected by, for example, grand jury privilege and other issues. Now, the parties told the court, excuse me, that the issue, they thought the issue could be resolved through a stipulation. This is reflected in the court's order. Right, and then that didn't work, and then the court said, well, you could use 50-60, even though he had the right to seek discovery. And then the court ultimately just said, you don't get anything. So, importantly, the court did not tell them to use 50-60. The taxpayers never renewed their motion to compel after they and the government agreed together that they thought they could resolve the issue. It was perfectly within reason for the Court of Federal Claims at that point to deny the motion to compel. Well, the parties say they can resolve it, so, you know, I'm going to deny the motion. And then later, the taxpayers never raised the issue again, except for this brief mention of 50-60 in their summary judgment briefing, which the applicable part is in page 2055 of the appendix. And there, they briefly suggested the court should entertain a motion under Rule 50-60. They did not make a motion, and they did not meet the requirements of Rule 50-60. So, again, the Court of Federal Claims, to the extent that could even be considered a request under Rule 50-60, properly denied any requests that they might have been making because they didn't make the showing for that relief. Can I turn back toward not the documents, but the substance?  What do you think the Adkinses should have done before December 31, 2004, to seek greater information that would provide a firmer foundation for a determination about the prospects of recovery? Well, Your Honor, certainly the Adkinses or their attorneys could have made some efforts to determine the assets that these folks had. I'm trying to understand what those assets are, what those measures, is that the word you use? What steps they actually could have taken to do that? Call up Mr. Freeman and say, what's in your bank account? Well, they could have tried that, Your Honor, but it's unlikely it would have been successful. Certainly, you know, lawyers are well-versed in doing property and asset searches. They could have looked for other liabilities that these folks may have had, whether there were judgments against those assets. But they're not allowed to do any discovery while the criminal proceedings are pending. Are you referring to the state of the arbitration? They couldn't do any civil discovery to get information relating to the criminal defendants because the FBI wouldn't have allowed it. Well, during the, that very well may be true, Your Honor, but during the pendency of the criminal proceedings and before the criminal proceedings started, there were other victims of this scheme who were able to secure arbitration judgments against Donald and company. Were any of them ever paid? Judgment is just a piece of paper. I don't know, Your Honor, that information is not in the record. That's really not that informative. And it wasn't just a pump and dump scheme that the government went after them for the whole money laundering thing too. Yes, Your Honor, that's true. There are also money laundering charges in the indictment. But the important thing is what was known or knowable in 2004. And what was known or knowable in 2004 is that three of the four Donald and company principals had been indicted and that they intended to plead guilty. And they simply didn't have the other pieces of information and apparently made no efforts to get any of the other pieces of information that they could have gotten. And I'd like to talk for a moment about Mr. Freeman, if I may. Suppose it were the case that any additional efforts would have been exceedingly unlikely to turn up anything and or exceedingly expensive. Would that play any role in the conclusion that we're presented with here? Well, Your Honor, the test is this very broad, holistic analysis, facts and circumstances test. So those are hypothetically factors that could be considered. But here there's no evidence of how expensive it would be or what kind of efforts they looked at. And indeed, quite frankly, I think it might have been difficult under even the best circumstances with some effort or the best effort from the taxpayers here in 2004. Simply because things were so unsettled with respect to the criminal defendants. Now, Mr. Freeman. So your case really does come down to this idea that if it's as a practical matter, impossible to know that this standard cannot be met, even if general knowledge would be such that recovery is exceedingly unlikely. General knowledge in the sense of? General knowledge that restitution is unlikely to produce much money. Future income of felons is not likely to produce much money. Your Honor, I think the Supreme Court has instructed and many courts have held that this is a fact specific inquiry. So, you know, I think it's important that the taxpayer doesn't have to be an eternal optimist. Yes, yes, indeed. Your Honor. That is what they said. But the court also said that the that the controlling factors are objective evidence and not the taxpayer subjective belief about what was going to happen here. And here in 2004, Mr. Adkins read the indictment and made a lot of conclusions that were not supported by the objective evidence. And I'd like, if I may, to move off of the folks who were indicted in 2004 and talk for a moment about Mr. Freeman. Mr. Freeman was one of the four principals of Donovan Company. That's a factual finding. The Court of Federal Claims made that the taxpayers have not challenged on appeal until just a few moments ago. And Mr. Freeman, Mr. Freeman's status as a principal was reported by Mr. Adkins to the FBI in 2003. The interview notes both acknowledge that Mr. Adkins dealt with Mr. Freeman and that Mr. Freeman was a principal at Donovan Company. Mr. Freeman was the only of the four principals with a personal connection to the taxpayers accounts. In 2001 and 2002, which were important years for the fraud that occurred here, Mr. Freeman was listed as the account executive or the investment representative on numerous joint and single held accounts by the taxpayers here. At trial, Mr. Adkins unprompted recognized Mr. Freeman's name on a document. And then the next day at trial, he said, oh, no, I don't know that person. And then upon further questioning, admitted that he had dealt with Mr. Freeman. So the Court of Federal Claims finding that Mr. Adkins had dealt with Mr. Freeman, unlike the other three principals who were included in the arbitration claim, rests on solid evidence in the record. Now, in an important distinction with the other three principals of Donovan Company, Mr. Freeman was indicted in 2005. So whatever concerns the taxpayer may have had in 2004 regarding the three Donovan Company principals that were indicted in 2004 could not have applied to Mr. Freeman. The taxpayers are required to reasonably exhaust avenues of recovery before benefiting from a tax deduction, before essentially benefiting from the government subsidy of their loss. The concept is to show with reasonable certainty that there will be no recovery, the taxpayers must explore the reasonable claims that are available to them. Can I ask you a question about the Ponzi scheme? Was it a revenue procedure? Yes. That says that in some circumstances, the year of indictment will be treated as the year of theft loss. Is that right? That's correct, yes. So what's the underlying rationale why that might make sense in that context, but not either more generally or at least not in the current context? So there are a couple of things that distinguish Ponzi schemes from a pump and dump scheme for tax purposes. One of them, and maybe this isn't for tax purposes, but just as a practical matter, the victims of a Ponzi scheme receive falsified statements. That's one of the classic hallmarks of a Ponzi scheme. They claim that their accounts have more in them than they actually do. And so it is very difficult for a victim of a Ponzi scheme to know that they have a loss or to discover that loss in any year except for the year of the indictment. That's often when the news breaks is when those victims find out. As I understand what you just said, that would explain why they shouldn't know about it before. This case is fundamentally about why in this case you think they had to wait until later. So why if the year of indictment in the Ponzi scheme context essentially makes it sufficiently clear that you're getting a pittance or less, why would that not be true here once there's an indictment? Put aside, Mr. Freeman. Well, Your Honor, the other reason that the IRS chose to make a special rule for Ponzi schemes, it has to do with the details of tax administration. But it's difficult in a Ponzi scheme, again, because of the falsified amounts that people are reporting on their tax returns. Here the taxpayers received monthly statements. They never claimed the statements themselves were false. Of course, they claim and we acknowledge that the price of the stock was pumped up in the pump and dump scheme. But in a Ponzi scheme, they're sometimes receiving small payouts to sort of keep them in the game. And trying to figure out the tax treatment for all of those small things is quite difficult. And so as these schemes became prevalent, unfortunately, in the mid-2000s, the IRS made a decision about administration. I'm not sure I'm communicating the rest of my mind because I don't think I understand this well enough. But I guess the thought that I'm wondering about is the Ponzi scheme revenue procedure appears to say once the bad guys are indicted, it's really quite clear that the victims are not going to get anything. Doesn't that tell one something about whether the indictment of the bad guys here is in the absence of other information? A really quite good reason to have a reasonable ascertainment that there's not going to be any money? No, Your Honor. So the focus of the IRS revenue procedure is not on this issue of a reasonable prospect of recovery. It's on the year of the discovery of the loss. And this is why the difference between a Ponzi scheme and a pump and dump scheme matters. Because the Ponzi scheme victims don't know they have a loss very often until that loss is made known through the news or indictment or other such things. The revenue procedure on the Ponzi scheme does not say that this is the year you can claim the loss? No, Your Honor. This is a question. I don't – my questions in the last few minutes were premised on the assumption it did. So that may be an incorrect assumption. Yes, Your Honor. No, it identifies the year of the indictment as the year of the loss. But the point that I'm failing to get across is that – But then the regulation about reasonable prospect still governs that, right? The revenue procedure doesn't repeal the regulation or it's just a – I don't know – a sub-regulation that gives an application of that regulation? No, Your Honor. It does not repeal the regulation. So I think my question then stands. Why does – if the indictment there means, must mean, there is no reasonable prospect of recovery, why should it not mean the same thing here? Again, putting aside Mr. Freeman. So the IRS is allowed and does in certain circumstances, such as here for Ponzi schemes, is allowed to provide more generous terms for – for deductions than may be generally applicable. And here, the IRS revenue procedure was put out, as it says, as an optional safe harbor method for Ponzi scheme victims to determine the year of the loss. Is there some theory along the following lines that the bad guys in Ponzi schemes often haven't pocketed anything, and therefore those kinds of bad guys, once indicted, we can assume will be deadbeats, whereas that's not true for this kind of bad guy? Your Honor, that very – may well have been part of the background thinking of the IRS in creating the special carve-out safe harbor for Ponzi schemes. As we were discussing earlier, one of the differences with the pump-and-dump scheme is that very often those who perpetrate the scheme do cash out real money from the scheme. That's the whole point, is to allow them to cash out their own stuff. I've never seen a Ponzi scheme where they didn't make money. I mean, that's the whole point of the Ponzi scheme, right? Is to make money. Yes, Your Honor. Of course they make money in a Ponzi scheme, but they do so in a – But the point is, you're saying – I mean, you're trying to argue that they're not analogous. The point is that they are analogous. The only difference is you're saying the government has the right to be nicer to certain victims than it is to other victims, and, you know, that's a fair argument. But it's kind of difficult for you to say that Ponzi schemes and these types of schemes are at least analogous for purposes of how easy it is to go after people who have been indicted and where the government is seizing all of their assets. Your Honor, of course there are some similarities, yes, between the two fraud schemes. But there are differences between the two kinds of schemes that help to explain why the IRS has provided the special treatment for Ponzi schemes and the general rule applies outside of that special provision. You're saying nothing is deductible even now? No, Your Honor, that's not what I'm saying. What I'm saying is that – All right, so when? What is the day? We need to come to some kind of closure. It's clear this is not recoverable. So, Your Honor, the taxpayers in this case chose when they filed their refund claim, all of the refund claims which were signed by attorneys, so they had professional help in filing these refund claims. And the taxpayers chose to identify 2004 as the sole year of their loss. The variance doctrine limits them to 2004 as the year of the loss in a subsequent tax refund litigation like this. And as a result, the evidence in this case has focused on the only year that the taxpayers could look to because that's how they chose to frame their refund claim, which is 2004. And I'm sorry, Your Honor, but the record here simply does not give enough information regarding the other years because it was focused on 2004 to answer your question with any certainty. And I apologize for that. Is it still possible or has time run out on the possibility of seeking refunds for later tax years? Well, Your Honor, the – It's a long time ago now. It is a long time ago now, yes. The general rule is that a refund claim can be filed within three years of when the return was filed. And at this point, we're quite a distance from the years that we're talking about. But as I mentioned earlier, when this case began in 2010, there was still time, still nearly another year and a half for the taxpayers to file a claim, for example, that the loss was in 2008. At that point, the taxpayers were on ample notice that the government's position was that 2004 was not the right year. But then – And they nonetheless – They would still be facing this unknowability. I don't know because we don't know what anyone had. And the government didn't produce the documents, so who knows what assets anyone had, right? Well, Your Honor, the government did produce a number of documents to the taxpayers. The government, as I understand it, produced the entire administrative files from the examination of the taxpayers. What would have been more knowable in 2008 than what was knowable in 2004? Well, Your Honor, the record simply isn't developed on 2008. But my point is that at least as the government stood here before you last time, you know, under the Court of Federal Claims' interpretation of the regulation, which this Court reversed, our position at that point was that 2008 was the right year. And within the timeframe of this litigation, they still could have filed a timely refund claim. And nonetheless, they chose to leave – But the IRS originally agreed, or at least the representative of the IRS originally agreed that 2004 was the correct year. But because of the statute of limitations, they had no choice but to go to the Court of Claims. Well, an IRS appeals officer who was an IRS employee with no settlement authority wrote a memo stating that in his view, 2004 was the right year. Now, the IRS appeals process doesn't have anywhere near the kinds of discovery procedures and such that litigation does. And so, you know, did the IRS appeals officer have all the facts at his disposal? Did he – you know, how much follow-up did he do? How much questioning did he do of the information the taxpayers provided? That's an entirely very different process from litigation. Can we move on? Okay. Any further questions?  Mr. Rogers. Thank you, Your Honors. A couple of things. I think the point on the standard of – the standard for recovery of the reasonable certainty standard and the reasonable possibility of recovery standard, as this Court pointed out, were the flip side of the same coin. They aren't a different coin. And certainly when it becomes reasonably certain that no reasonable likelihood of recovery is there, is what the Court was saying, is that clearly in this case, you know, you have to have some certainty that you think that it's not going to lead anywhere. Second of all, there was some question about discovery of their assets. Throughout the arbitration proceeding, discovery was produced against these defendants, the criminal defendants as well as Donald and Company, and nothing was ever produced by them to Mr. Atkins' attorneys throughout the record and testimony. I think the Court asked a good question as to when is the deduction recoverable. We've asked that question throughout the whole trial, and that answer has never been made by the government. Did the government last time a couple of years ago when they were here say 2008 was the right year? They said that's what the Court found. They never really pinned themselves down even to that, I don't believe. But I could be wrong. I don't remember every word they said back then, but I don't believe so. As to where the money went, you know, I think there's several points in the record that made it kind of clear where the money went. There was JX-76, which was a long article that got into the record by an investigative reporter that said that the money went to organized crime, and that's also shown by the charge of money laundering in the indictment, we believe, and the fact that the record was sealed for a period of time and that all these defendants agreed to cooperate. Well, who were they cooperating with? Why were they cooperating if they were all part of the same scheme? Obviously, they were cooperating for something. So I think there's some of that. Also, obviously, the tech boom ended around that time, and I think if they were invested in tech stocks, other monies would have gone. So I think we have some idea where the monies went in that regard. In closing, I think also, as to Mr. Freeman, yes, he was indicted in 2005, but again, Mr. Atkins, I think, believed he was in 2004 from his information. As I said, he recognized the name, but they never went after him in arbitration, and they would have if they thought he was enough of a part of it. So again, that was not done. But clearly in 2004 was really when the roof caved in on these people, and we believe that that was when the loss was fixed. If the court has no further questions, we thank the court for its time and appreciate your consideration. Thank you. Thank you both. The case is taken under submission.